**Dean POLING, Plaintiff–Appellant,**

**v.**

**Ellis MURPHY, et al.,
Defendants–Appellees.**

**No. 88–5538.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 7, 1989.

Decided April 18, 1989.

Rehearing and Rehearing En Banc
Denied June 28, 1989.

Penny J. White (argued), Johnson City, Tenn., for plaintiff-appellant.

David R. Shults, Erwin, Tenn., William C. Bovender, Kingsport, Tenn., Nathaniel R. Coleman, Jr., Thomas J. Garland (argued), Milligan, Coleman, Fletcher, Gaber & Kilday, Greenville, Tenn., for defendants-appellees.

Before ENGEL, Chief Judge, and MERRITT and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

The main question presented in this appeal is whether the Federal Constitution gives a high school student license to make admittedly "discourteous" and "rude" remarks about his schoolmasters in the course of a speech delivered at a school-sponsored assembly. Until recent years, lawyers and educators alike might have found it puzzling that such a question should even be asked. Not today; the question is a serious one, under contemporary constitutional concepts, but on the factual record before us in this case, we think the answer is fairly obvious.

As the Supreme Court held last year in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, ——, 108 S.Ct. 562, 571, 98 L.Ed.2d 592, 606 (1988), "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." (Footnote omitted.) Civility is a legitimate pedagogical concern, in our view, and we shall affirm the summary judgment that the district court entered in favor of the defendants in this case.

I

Unicoi County High School, in Erwin, Tennessee, is a public high school with a total enrollment of about 875 students. Each spring the school conducts an election at which officers are chosen for the school's student council. Candidates for president of the council come from the school's junior class, and candidates for vice-president from the sophomore class.

In May of 1987 plaintiff Dean Poling, an honor student who was subsequently to become president of his senior class, was one of about a dozen juniors who had qualified as candidates for the Unicoi High student council presidency. It was customary for such candidates to give campaign speeches at a school assembly held shortly before the election. Except for pupils with excused absences, attendance at the assembly was mandatory for all members of the student body.

According to Mrs. Barbara Ollis, a guidance counselor who served as one of two faculty sponsors of the student council, it had long been the practice for faculty sponsors to review candidates' speeches in advance of delivery. About a week before the 1987 election campaign assembly, therefore, Mrs. Ollis met with the student candidates, including Dean Poling, and told them to submit drafts of their speeches to her for review. The deadline she set was Thursday, May 7, the day before the assembly. Mrs. Ollis emphasized to the candidates, according to her affidavit, "how important it was, especially for the President of the Student Council, to work in a cooperative way with the Administration in order that the Student Council could be effective in carrying out its function in bringing about changes which it thought would be appropriate."

As instructed, Dean Poling brought his proposed speech to Mrs. Ollis for review on Thursday afternoon, May 7. Mrs. Ollis read the speech "very carefully," as she

later attested, because it contained a "sick-baby joke" that initially struck her as being in dubious taste. The proposed speech read as follows:

"Hi, I'm Dean Poling and I'm running for president of the Student Council.

It's a common practice of politicians to cut down each other. Instead of doing this, I'm going to cut down you, the audience. Why am I going to do this? Because you idiots are too darn gullible. For example, what is black and blue and wrapped in plastic? A baby in a trash bag, of course.

I just made you laugh at something incredibly sick. If I can do this to you, then the administration could probably take advantage of you also. For example, have you noticed that each year there are less and less assemblies? How many of you would like at least a chance at open campus? Would you like a better chance of having the prom in Johnson City? Is there something in this school you would like changed? The administration plays tricks with your mind and they hope you won't notice. Because of the administration's iron grip, our school has been kept behind other schools like Science Hill. If you want to break this grip, vote for me for president. I can try to bring back student rights that you have missed and maybe get things that you always wanted. All you have to do is vote for me, Dean Poling!

Thanks."

Mrs. Ollis, a former teacher of English, made a grammatical correction in the text of the speech, changing "less and less assemblies" to "fewer and fewer assemblies." She also placed a mark beside the sentence that referred to "the administration's iron grip" and told Dean, as he later attested, "change this and your speech will be okay."

Change it he did. As delivered at the assembly on Friday, May 8, the speech had this peroration:

"The administration plays tricks with your mind and they hope you won't notice. For example, why does Mr. Davidson stutter while he is on the intercom? He doesn't have a speech impediment. If you want to break the iron grip of this school, vote for me for president. I can try to bring back student rights that you have missed and maybe get things that you have always wanted. All you have to do is vote for me, Dean Poling."

When Dean gave his revised speech, according to Mrs. Ollis, many of the students jumped up at the reference to Mr. Davidson (the assistant principal in charge of discipline at the school), clapped their hands, and yelled things like "way to go, Dean," and "we don't like him either."[1] The clapping, yelling, and so forth did not go "above or beyond that present for any of the candidates," according to several other affiants, and Mrs. Ollis may or may not have been guilty of exaggeration when she swore, as she did in her affidavit, that the Davidson remark "brought the house down." Be that as it may, the remark unquestionably brought down the ire of the school's principal, defendant Ellis Murphy. "I was quite upset," Mr. Murphy stated, adding that "I thought that the content of this speech was inappropriate, disruptive of school discipline, and in bad taste."

At the conclusion of the assembly, according to Dean Poling's affidavit,

"Mr. Murphy told me that he did not like my speech and that it was in bad taste. I responded, 'I am sorry [you didn't like it] but it got me votes.' Mr. Murphy said it did not matter that it got me votes because it was in bad taste."

Mr. Murphy's affidavit says that Dean volunteered to apologize to Mr. Davidson. This proposal met with Murphy's enthusiastic approval, and the record contains no indication that Dean failed to make the promised apology to Mr. Davidson.

Later in the morning of the assembly, Mrs. Ollis tells us in her affidavit, two of the other student candidates came to her

---

1. In a motion to strike portions of the defendants' affidavits, plaintiff Poling contended that this and other passages in the affidavits constituted inadmissible hearsay. The contention has no merit, and the district court did not err in failing to grant the motion.

office at different times and complained that Dean Poling had gained an unfair advantage in the election by saying what he had said about Mr. Davidson. This opinion was also expressed by the incumbent student council president, a member of the senior class. Principal Murphy, the incumbent president, and both of the faculty sponsors participated in a mid-morning conference at which "[i]t was the consensus that Dean Poling should be declared ineligible to run...." Superintendent of Schools Ron Wilcox subsequently concurred in the decision to declare Dean ineligible.

Dean and his father, Mr. Roy Poling, a minister and substitute teacher, met with Mrs. Ollis and Principal Murphy in the latter's office that Friday afternoon. The Polings were informed that Dean had been disqualified, and a lengthy discussion ensued. Principal Murphy, according to his affidavit, commented on Dean's alleged "disobedience of instructions, the disruptive effect he had had on the authority of the Administration, the insensitivity that he had shown by the derogatory remarks that he had made in public about Assistant Principal Davidson and the bad taste he had shown generally." Mr. Murphy also alluded to a vice-presidential campaign speech that Dean had made the year before, for which Dean was said to have been reprimanded because "it was given in black language (the type used by stand-up comics) ... that offended many people." (There were no black students at Unicoi, and it does not appear that Dean had consciously intended to offend anyone in the earlier speech.)

With respect to the comment on Mr. Davidson and his "stutter," Dean's father himself expressed the view that "it was very discourteous." Mr. Poling explained, however, that Dean "was not attacking Mr. Davidson, but the administration." The administration, in the person of Principal Murphy, remained unmoved; the disqualification was not revoked, and the election went forward on Monday, May 11, with a reduced field of candidates.

To make the election more realistic, Mrs. Ollis had arranged to rent two voting machines from the Unicoi County Election Commission. Mrs. Ollis planned, at one point, to prepare new ballots omitting the names of Dean Poling and a student named Beth Edens, who had withdrawn as a candidate at the instance of her mother. Mrs. Ollis was told, however, that the use of new ballots would result in a doubling of the election commission's charges, so on the morning of the election she had the following announcement read over the school's public address system during the regular daily "announcement time:"

"There are two students' names that remain on the ballot for their respective offices who are no longer candidates. These students are Beth Edens and Dean Poling. Therefore, any votes cast for Beth or Dean will not be counted."

Dean's father, who had acquiesced in the school's decision on Friday, was not at all pleased by this method of effectuating the disqualification of his son. At a tape-recorded meeting held on Tuesday, May 12, 1987, between the Polings and their lawyer and the school administrators, Mr. Poling complained that

"I was told that [Dean's] name would not be on the ballot and he would not be allowed to run. Monday, his name was on the ballot. Monday, over the intercom in front of everyone, they were told that ... it would do no good to vote for Dean or in words similar to that."

Mr. Poling took this as an effort "to put Dean down, to humiliate him." Notwithstanding his repeated concessions that what Dean had said about Mr. Davidson was "very discourteous"—or, as he said at another point, "very rude"—Mr. Poling concluded that "[t]here was someone out to get Dean." Dean had been told to change the speech in one particular, as Mr. Poling saw it; Dean had changed the speech in that particular, in Mr. Poling's view, and an administration that had "set out to crush Dean" then publicly humiliated him.

Mr. Poling warned the administrators that "there is a higher court than you four." Superintendent Wilcox agreed, and encouraged Mr. Poling to take the matter

to the board of education if he was not happy with the decision:

> "[O]ur board meets Thursday night and I encourage you to come to our board of Education and I encourage you to ask them for a hearing and they will hear [it] and if we're wrong they'll overturn it."

Mr. Poling did not ask for a hearing before the board of education. Instead, a federal civil rights action was filed in Dean's name, by his parents as next friends, against the four school administrators and the board of education. The complaint alleged violations of Dean's rights under the First and Fourteenth Amendments of the United States Constitution, and it sought declaratory and injunctive relief and an award of damages in the amount of $300,000.

The defendants moved for summary judgment, supporting the motion with affidavits. The Polings filed opposing affidavits. The district court (Thomas J. Hull, J.) granted the motion for summary judgment and dismissed the action. A motion for reconsideration was overruled, and this appeal followed.

## II

Did the school officials overreact in declaring Dean Poling ineligible for election? The district court recognized that possibility ("it may be that the school administration overreacted to the speech"), and for all we know there may in fact have been an overreaction. But a federal court is obviously not the ideal body to try to answer such a question.

The Unicoi County Board of Education, from which the Polings could have sought redress had they wished, presumably were acquainted with at least some of the participants in this drama. We are not. We are not steeped in the culture of the place where the events occurred, moreover, and we have no firsthand knowledge of the atmosphere of the school or of the sense of propriety of those who work and study there. We are such outsiders, indeed, that we are at a loss even to understand the full significance of Dean Poling's reference to Mr. Davidson's "stutter." (The affidavit of Mrs. Ollis says, without contradiction, that Mr. Davidson does not stutter.) It is not improbable that the local board of education would have had, or could readily have acquired, a better sense of what actually was going on in the assembly than a remote federal court could reasonably aspire to.

Our impression, for whatever it may be worth, is that this is a tale without heroes and without villains—without a village Hampden, to borrow Mr. Justice Jackson's memorable phrase,[2] and without a village tyrant. Dean Poling appears to be an intelligent and imaginative young man, and probably no more anarchistic than many of his teachers at his age. Like most teenagers, Dean doubtless feels embarrassment very keenly—but he may not fully have appreciated that the assistant principals of this world are sentient beings also, some of whom may even be capable of experiencing embarrassment themselves. The transcript of the May 12 meeting between the Polings and the administrators—the only part of the record in which the players speak in their own voices, rather than in words written for them by their lawyers—suggests that the administrators of the Unicoi County High School are decent, well-meaning individuals who bore Dean Poling no ill will and who had no sinister plan to humiliate him before his peers. It may well be that a more relaxed or more self-assured administration would have let the incident pass without declaring Dean ineligible, and perhaps that is what this administration ought to have done; it is not for us to say. Such a question, we believe, represents a judgment call best left to the locally elected school board, not to a distant, life-tenured judiciary. Cf. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 683, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986) ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.")

---

2. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). Cf. *Rex v. Hampden* (1637) 3 Howell's State Trials 825.

■ It is true, to be sure, that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," and "[s]chool officials do not possess absolute authority over their students." *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506 and 511, 89 S.Ct. 733, 736 and 739 (1969). It also remains true, however, that the Federal Constitution does not compel "teachers, parents, and elected school officials to surrender control of the American public school system to public school students." *Fraser,* 478 U.S. at 686, 106 S.Ct. at 3166, quoting *Tinker,* 393 U.S. at 526, 89 S.Ct. at 746 (Black, J., dissenting). (Cf. *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 570 n. 4, 98 L.Ed.2d 592, 605 n. 4, where Justice Black's observation was also thought relevant.) Limitations on speech that would be unconstitutional outside the schoolhouse are not necessarily unconstitutional within it.

■ The Supreme Court has drawn a distinction between "personal expression that happens to occur on school premises" and expressive activities that are "sponsored" by the school and "may fairly be characterized as part of the school curriculum...." *Hazelwood,* at ——, 108 S.Ct. at 569–70, 98 L.Ed.2d at 605. Speech sponsored by the school is subject to "greater control" by school authorities than speech not so sponsored, because educators have a legitimate interest in assuring that participants in the sponsored activity "learn whatever lessons the activity is designed to teach...." *Id.* As long as the actions of the educators are "reasonably related to legitimate pedagogical concerns," therefore, the *Hazelwood* Court held, as we have seen, that "educators do not offend the First Amendment by exercising editoral control over the style and content of student speech in school-sponsored expressive activities...." *Id.,* at ——, 108 S.Ct. at 571, 98 L.Ed.2d at 606.

■ Applying these concepts to the case at hand, there can be no doubt that the election and election assembly were "school-sponsored" activities within the meaning of *Hazelwood.* (Plaintiff Poling's reply brief suggests that "by definition" student government is incapable of the sort of pedagogical purpose that merits school sponsorship; we find this suggestion unintelligible.) School officials scheduled the assembly to be held during school hours and on school property. They made attendance compulsory for everyone. They determined the eligibility of prospective speakers. They rented the voting machines. And they vetted the speeches in advance, correcting inappropriate grammar and attempting to weed out or temper inappropriate content. There is no genuine issue as to any material fact regarding school sponsorship. The only real question, under *Hazelwood,* is whether the actions of the school officials were reasonably related to "legitimate pedagogical concerns"—and the existence or nonexistence of such a relationship, we take it, is a question of law.

The universe of legitimate pedagogical concerns is by no means confined to the academic; as the Supreme Court put it in *Fraser,* "schools must teach by example the shared values of a civilized social order." 478 U.S. at 683, 106 S.Ct. at 3165. Sometimes, of course, these "shared values" come in conflict with one another; independence of thought and frankness of expression occupy a high place on our scale of values, or ought to, but so too do discipline, courtesy, and respect for authority. Judgments on how best to balance such values may well vary from school to school. Television has not yet so thoroughly homogenized us that conduct deemed unexceptionable in New York City, for example, will necessarily be considered acceptable in rural Tennessee.

Local school officials, better attuned than we to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted. We may disagree with the choices, but unless they are beyond the constitutional pale we have no warrant to interfere with them. Local con-

trol over the public school, after all, is one of this nation's most deeply rooted and cherished traditions. See *Milliken v. Bradley,* 418 U.S. 717, 741–42, 94 S.Ct. 3112, 3125–26, 41 L.Ed.2d 1069 (1974).

To the administrators of the Unicoi County High School, Dean Poling's seemingly gratuitous comment on Assistant Principal Davidson was in "bad taste." Whether it strikes us so is immaterial; *"de gustibus,"* as the ancient wisdom has it, *"non disputandum est."* It was not irrational, to say the least, for the school authorities to take offense at a remark that was calculated to get Dean votes at the expense of the assistant principal's dignity.

The art of stating one's views without indulging in personalities and without unnecessarily hurting the feelings of others surely has a legitimate place in any high school curriculum, and we are not prepared to say that the lesson Unicoi High tried to teach Dean Poling and his captive audience was illegitimate. Neither can we say that the method by which the school sought to drive the lesson home was so extreme as to violate the Constitution. See *Schwartz v. Schuker,* 298 F.Supp. 238 (E.D.N.Y.1969) (ban on distribution of underground school newspaper within school grounds upheld, where newspaper referred to principal as "King Louis" and "a big liar" with "racist views and attitudes"); *Bystrom v. Fridley High School,* 686 F.Supp. 1387 (D.Minn. 1987), *aff'd,* 855 F.2d 855 (8th Cir.1988) (suspension of students who distributed newspaper referring to vandalism at home of high school teacher as "pretty damn funny" did not violate First Amendment rights).

Our conclusion is consistent with the recent decision in *Crosby v. Holsinger,* 852 F.2d 801 (4th Cir.1988). In that case a high school principal acted to censor displays of a school symbol, "Johnny Reb," because of complaints from black students and parents that they found the symbol offensive. A directed verdict for the principal in a suit alleging that he had violated the First Amendment was affirmed, the court of appeals noting that because "[a] school mascot or symbol bears the stamp of approval of the school itself," it was sufficient that the principal's decision to eliminate the symbol was "based on legitimate concerns." *Id.* at 802. If it was legitimate for the school officials in *Holsinger* to restrict student expression because it insulted a segment of the student body, it was legitimate for the school officials here to restrict speech considered insulting to the officials themselves.

It is important to bear in mind, we think, that the school officials made no attempt to compel Dean Poling to say anything he did not want to say. In the great compulsory flag salute case, *West Virginia State Board of Education v. Barnette, supra,* 319 U.S. 624, 63 S.Ct. 1178, the Supreme Court was "dealing with a compulsion of students to declare a belief." *Id.* at 631, 63 S.Ct. at 1182. The state in that case affirmatively "require[d] the individual to communicate by word and sign his acceptance of the political ideas [the flag] ... bespeaks." *Id.* at 633, 63 S.Ct. at 1183. The compulsory flag salute and pledge of allegiance "require[d] affirmation of a belief and an attitude of mind," and it seemed to Mr. Justice Jackson in *Barnette,* as it seems to us here, that "involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence." *Id.* at 633, 63 S.Ct. at 1183. A student must not be compelled to affirm a belief in the flag against his will, as *Barnette* held, but it does not follow that a student must therefore be permitted to insult his teachers against their will.

It is also important to bear in mind, again, that Dean Poling's speech—unlike the symbolic acts of John and Mary Beth Tinker in wearing black armbands to school, see *Tinker, supra,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)—was speech sponsored by the school and disseminated under its auspices. "A school *must* be able to set high standards for the student speech that is disseminated under its auspices," *Hazelwood, supra,* 484 U.S. at ___, 108 S.Ct. at 570–71, 98 L.Ed.2d at 605–06 (emphasis supplied), and the Supreme Court has made it quite clear that the First Amendment standard for determining when non-sponsored student speech may be

punished is a standard that need not be applied where sponsored student speech (a student newspaper, *e.g.*, or a student council election campaign) is concerned. *Id.* at ___, 108 S.Ct. at 571, 98 L.Ed.2d at 606. "Instead," the Supreme Court said in *Hazelwood*, "we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* If words have meaning, that is the First Amendment test which we are required to apply to Dean Poling's campaign speech.

### III

Dean Poling's disqualification did not, as we see it, violate his due process rights under the Fourteenth Amendment. The Due Process Clause says that "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. We do not believe that Dean has shown any deprivation of "life" or "liberty" or "property" within the meaning of this clause.

■ This court has heretofore held that "[t]he privilege of participating in interscholastic athletics ... [is] outside the protection of due process." *Hamilton v. Tennessee Secondary School Athletic Association*, 552 F.2d 681, 682 (6th Cir.1976). The privilege of participating in a student council election seems no different.

We are told on appeal that it has been customary to grant a $100 college scholarship to the Unicoi High student council president. If we are entitled to make use of this information, we think it changes nothing. Dean Poling had no guarantee that he would have been elected president if not disqualified, and no guarantee that he would have received the scholarship. He had, at best, "a mere expectation rather than a constitutionally protected claim of entitlement." *Walsh v. Louisiana High School Athletic Association*, 616 F.2d 152, 159 (5th Cir.1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981).

■ We see nothing improper, moreover, in the process through which Dean's disqualification was effected. Dean was put on notice before he gave his speech that it was considered important for the president of the student council "to work in a cooperative way with the Administration." He was specifically told that his proposed reference to "the administration's iron grip" would have to be changed. Dean was far too intelligent, as the district court recognized, to suppose that a reference to "the iron grip of this school" would be made more palatable to the administration by the introduction of a discourteous reference to the assistant principal and his "stutter."

The district court found that "it could not have been a surprise to [Dean] Poling that he received some discipline." There was no showing to the contrary. Dean obviously elected to gamble on the forbearance of the administration, hoping to win additional votes from his peers, and he simply lost his gamble. Politics is the art of the possible, it has been said, and Dean knows now that one misjudges the possible at his peril. The price Dean paid in learning this valuable lesson does not seem excessive, particularly in light of the fact that he went on to win election to the presidency of the senior class.

It is true that the administration had decided to disqualify Dean for the student council presidency before he was accorded a hearing, but Dean and his father were promptly given a two-hour audience with the principal and Mrs. Ollis on Friday afternoon, three days before the election. At least two further sessions were conducted within a day or two after the election. There is no reason to doubt that the board of education would have entertained an appeal from the administration's decision had the Polings requested one, as Superintendent Wilcox encouraged them to do. Surely the Due Process Clause would have required nothing more than this even if a deprivation of some constitutionally protected liberty or property interest had been established.

The judgment of the district court is AFFIRMED.

MERRITT, Circuit Judge, dissenting.

The Court has applied the wrong First Amendment test to this student's political speech and has therefore reached the wrong result.

The applicable First Amendment cases hold that when a high school student engages in political or "pure speech" in a school forum the student is protected by the First Amendment under a test substantially similar to that for adults. In the compulsory flag salute case, Justice Jackson, speaking for the Court, said:

> The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted.... That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

In the black arm band protest case, *Tinker v. DesMoines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Court said that in political speech cases students

> may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of *constitutionally valid reasons* to regulate their speech, students are entitled to freedom of expression of their views.

*Id.* at 511, 89 S.Ct. at 739 (emphasis added). Neither *Barnette* nor *Tinker* has been overruled. They continue to teach that the First Amendment protects the political speech of public-school students.

After the passage just quoted, *Tinker* goes on to state the "constitutionally valid reasons" for regulating student speech. The protected category of political speech does not include

> conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behav-

ior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others....

*Id.* at 513, 89 S.Ct. at 740. In the student political speech cases, the Supreme Court makes clear that the question is not one of "civility," "rudeness" or "bad taste" as my brothers seem to think. The question is one of "disruption" and "substantial disorder."

Recent cases permitting schools to regulate speech of secondary school students have explicitly declined to overrule *Barnette* and *Tinker*. In *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 [106 S.Ct. 3159, 92 L.Ed.2d 549] (1986), the Supreme Court specifically noted that the regulation of sexually explicit and salacious student speech was "unrelated to any political viewpoint" and, thus, did not implicate the rule announced in *Tinker*. *Bethel School Dist.*, 478 U.S. at 685 [106 S.Ct. at 3166]. And in *Hazelwood School Dist. v. Kuhlmeier*, [484 U.S. 260], 108 S.Ct. 562 [98 L.Ed.2d 592] (1988), the Supreme Court held that the rule of *Tinker* need not apply where a school wishes to "refuse to lend its name and resources to the dissemination of student expression." *Hazelwood*, 108 S.Ct. at 570. The sort of "legitimate pedagogical concern" that warranted the regulation of student speech in *Hazelwood* was a school's decision not to permit a student paper to invade the right of privacy of an unwed, pregnant student.

By ignoring the co-existence in our law of *Barnette* and *Tinker* on the one hand, and *Bethel* and *Hazelwood* on the other, the majority virtually erases the rule of the earlier cases. Political speech of students that does not threaten to foment "substantial disorder," "disruption" or "invasion of privacy" is still protected under the First Amendment. Because the majority has used the wrong standard, it has reached the wrong result. There is no evidence in this case of "substantial disorder," "disruption" or "invasion of privacy."

Dean Poling's speech to 800 students at the high school assembly was "political speech," pure and simple. It was not a vulgar speech like the one found unprotected in *Bethel* or a gross invasion of the right of privacy of an unwed, pregnant

student as in *Hazelwood.* Poling was running for president of the student body of his school. He made a tough populist speech, short but not sweet. His main point was this:

> If you want to break the iron grip of this school, vote for me for President. I can try to bring back student rights that you have missed and maybe get things that you have always wanted. All you have to do is vote for me, Dean Poling.

His fellow students from the hills and hollows of rural upper East Tennessee stood and cheered, but they were not disruptive. Although critical of the administration and of one particular teacher, the speech cannot be classified as one which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker,* 393 U.S. at 513, 89 S.Ct. at 740. If the school administration can silence a student criticizing it for being narrow minded and authoritarian, how can students engage in political dialogue with their educators about their education?

For the foregoing reasons, I respectfully dissent.