# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3439

_____

| | | |
|---|---|---|
| Adam Henerey, by and through his parent and next friend Michael Henerey, | * * * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| City of St. Charles, School District; Jerry Cook, principal, individually and in his official capacity; David Watson, assistant principal, individually and in his official capacity, | * * * * * | |
| | * | |
| Appellees. | * | |

_____

Submitted: April 21, 1999

Filed: December 29, 1999

_____

Before RICHARD S. ARNOLD and WOLLMAN,[1] Circuit Judges, and
WOLLE,[2] District Judge.

_____

_____

[1]Roger L. Wollman became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 24, 1999.

[2]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa, sitting by designation.

WOLLMAN, Chief Judge.

Adam Henerey appeals from the district court's[3] grant of summary judgment in favor of the City of St. Charles School District (District) in this 42 U.S.C. § 1983 action based on a claimed violation of the First Amendment. We affirm.

## I.

In March 1997, Henerey, then a sophomore at St. Charles High School, applied to run for junior class president in an upcoming student council election. Although candidacy was open to all members of the sophomore class, those seeking to run were required to meet with Mary Stodden, the student council advisor, and to sign a contract of obligation. Under the terms of the contract, candidates agreed to obey all school rules. After Henerey signed the contract, a member of the student council advised him that all campaign flyers and posters had to be approved by the administration prior to distribution.

The campaign officially began on April 7, 1997. Henerey obtained approval from the administration for his campaign slogan, "Adam Henerey, The Safe Choice." On the evening of April 7, Henerey was informed by Stodden that other candidates had complained that his posters had been posted over theirs and that references to other candidates were demeaning. Stodden then told Henerey that all materials needed to be approved by the administration.

On the morning of April 10, 1997, the day of the election, Henerey handed out in the school hallways some eleven condoms attached to stickers bearing his campaign

_____

[3]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

-2-

slogan. He had given the administration no prior indication that he planned to distribute condoms or that his campaign would in any way involve sex-related topics.

As Ms. Stodden was counting the ballots, a student complained to her about Henerey's distribution of condoms. Ms. Stodden in turn relayed the complaint to Dr. Jerry Cook, the school principal, who determined that Henerey should be disqualified from the student election for his failure to comply with School Board Rule KJ-R, which required students to get prior approval from the school principal or assistant principal before distributing any materials. A subsequent count of the votes revealed that Henerey had received a majority of the votes for junior class president.

Henerey then filed this action, alleging that the District violated 42 U.S.C. § 1983 by suppressing his First Amendment right to free speech. The district court found that although a material dispute existed whether Henerey's conduct constituted constitutionally protected speech, the rule restricting the types of electioneering materials that could be distributed was constitutional. The court concluded that the student election was a school-sponsored activity that took place in a nonpublic forum and that Dr. Cook's decision to disqualify Henerey for his failure to comply with Rule KJ-R was reasonably related to the school's legitimate pedagogical goals. Accordingly, it granted the District's motion for summary judgment.

## II.

We review a grant of summary judgment de novo. See Hossaini v. Western Missouri Med. Ctr., 140 F.3d 1140, 1142 (8th Cir. 1998). Summary judgment should be granted if the evidence, viewed in the light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969), the Constitution does not compel "teachers, parents, and elected school officials to surrender control of the American public school system to public school students." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 686 (1986) (quoting Tinker, 393 U.S. at 526 (Black, J., dissenting)). The constitutional rights of public school students "are not automatically coextensive with the rights of adults in other settings," Fraser, 478 U.S. at 682, and a school need not tolerate speech that is inconsistent with its pedagogical mission, even though the government could not suppress that speech outside of the schoolhouse. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (citing Fraser, 478 U.S. at 685); Poling v. Murphy, 872 F.2d 757, 762 (6th Cir. 1989) ("Limitations on speech that would be unconstitutional outside the schoolhouse are not necessarily unconstitutional within it."). Therefore, courts must analyze First Amendment violations alleged by students "in light of the special characteristics of the school environment." Hazelwood, 484 U.S. at 266 (quoting Tinker, 393 U.S. at 506).

Purely individual speech by students constituting "personal expression that happens to occur on the school premises" is subject to a high degree of First Amendment protection. Hazelwood, 484 U.S. at 271. However, school officials may restrict even individual student expression that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school," or that "would substantially interfere with the work of the school or impinge upon the rights of other students." Tinker, 393 U.S. at 509 (citations and internal quotation marks omitted).

When the expressive conduct at issue occurs in the context of a school-sponsored activity that is not also a public forum, the authority of schools to exercise control over the content of speech is at its greatest. See, e.g., Hazelwood, 484 U.S. at 276 (school may censor official student newspaper); Fraser, 478 U.S. at 678 (school

may ban sexually suggestive language in speech before high school assembly); Lacks v. Ferguson Reorg. Sch. Dist. R-2, 147 F.3d 718, 724 (8th Cir. 1998) (school may ban profanity in creative writing class), cert. denied, 119 S.Ct. 1158 (Mar. 8, 1999); Poling, 872 F.2d at 764 (school may ban insulting references in student council election speech).  In the absence of a public forum, school officials may limit a student's speech in a school-sponsored activity if the limitation is "reasonably related to legitimate pedagogical concerns."  Hazelwood, 484 U.S. at 273.

## A.
### 1.

Henerey argues that the campaign for class president must be considered a forum for public expression.  The nature of the forum affects the degree of protection the First Amendment affords to expressive activity, even within the public school setting.  See, e.g., Hazelwood, 484 U.S. at 267 (conducting forum analysis as first step in addressing student speech claim); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue."); Muller v. Jefferson Lighthouse Sch., 98 F.3d 1530, 1540 (7th Cir. 1996) (prior restraint of student speech not unconstitutional in nonpublic forum).

Although school facilities are traditionally deemed nonpublic fora, they may be designated public when school authorities have a policy or practice of opening them for indiscriminate use by the general public, or by some segment of the public such as student organizations.  See Good News/Good Sports Club v. School Dist. of the City of Ladue, 28 F.3d 1501, 1513 (8th Cir. 1994) (citing Hazelwood, 484 U.S. at 267).  "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public

discourse." <u>Hazelwood</u>, 484 U.S. at 267 (quoting <u>Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.</u>, 473 U.S. 788, 802 (1985)).

Here, the District did not open the campaign to the public, and it obviously intended to control the speech associated with the student election. Only enrolled students were eligible for candidacy in the election, and those who sought an elected position were required to sign an agreement stating that they would obey school rules. In addition, all campaign materials had to be approved prior to their distribution or use. Thus, because there is no evidence that the school intended by "policy or practice" to relinquish its control over the election and designate it a forum for public expression, <u>see</u> <u>Good News</u>, 28 F.3d at 1513, we conclude that the election was conducted within the context of a nonpublic forum.

## 2.

The next question is whether Henerey's expression was school-sponsored speech or independent student speech. <u>See</u> <u>Hazelwood</u>, 484 U.S. at 270-71. A school may exercise greater control over student speech uttered during participation in a school-sponsored activity than that expressed during an independent activity because "students, parents, and members of the public might reasonably perceive [the school-sponsored speech] to bear the imprimatur of the school." <u>Id.</u> at 271. Such control also "assure[s] that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." <u>Id.</u> Although to be considered "school-sponsored," expressive activities must be "curricular" in a broad sense, they need not "occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." <u>Id.</u> (footnote omitted).

The election was supervised by a school administrator serving as the student council advisor, and it ran for a limited time period set by the school. It was operated under the auspices of the school administration, and any member of the public could reasonably have concluded that campaign materials were distributed with the implied approval of the school. Moreover, the election was conducted for the pedagogical purposes of allowing candidates to learn leadership skills and exposing the general student body to the democratic process. Accordingly, we agree with the district court that the election was a school-sponsored activity that was a part of the school's curriculum. See Poling, 872 F.2d at 762 (there can be "no doubt" that a student election is a school-sponsored activity for First Amendment purposes). In this setting, the question becomes whether the District's decision to disqualify Henerey from the election was reasonably related to legitimate pedagogical concerns. See Hazelwood, 484 U.S. at 273.

**B.**

**1.**

We turn first to the District's contention that the sole basis for its decision to disqualify Henerey was his violation of school rules. The relevant portions of Rule KJ-R read as follows:

ADVERTISING IN THE SCHOOLS  (Board Policy KJ-R)

1. Places
   The distribution of such items may take place in a location approved by principal of the school.
. . . .
3. Approval
   The approval must be obtained the previous day or earlier from the principal or assistant principal.  (For materials not readily classifiable or approvable more than one school day should be allowed.)  The

approved articles will bear the official stamp of the school, "Approved for Distribution or Posting"

. . . .

5. Unacceptable Items

Hate literature which attacks ethnic, religious or racial groups, other irresponsible publications aimed at encouraging hostility and violence; pornography, obscenity and materials unsuitable for distribution in the schools is unacceptable as well as:

a. Materials judged libelous to specific individuals in or out of school

b. Materials designed for commercial purposes - to advertise or promote a product or service for sale or rent.

c. Materials which are designed to solicit funds unless approved by the superintendent or his assistant

d. Materials the principal is convinced would materially disrupt class work or involve substantial disorder or invasion of the rights of others

6. Acceptable Materials

All materials not proscribed in "Unacceptable items".

The District's position is that it disciplined Henerey simply because he had failed to comply with Rule KJ-R. The District contends that it acted reasonably because it has a legitimate interest in disciplining students who do not obey school rules, noting that despite repeated warnings, Henerey failed to obtain prior approval for his campaign materials.

Henerey argues that because other students distributed materials, such as candy and gum, without prior approval and were not disciplined, the District's decision to disqualify him from the election was based on the content of his message. The District responds by pointing out that handing out candy on election day has been a long-standing practice at the school, one that has been tacitly approved by the administration. We find nothing in the record to challenge the District's representation

on this point, and thus we conclude that Henerey has provided no evidence of selective, content-based enforcement of Rule KJ-R.

**2.**

Henerey argues that Rule KJ-R is unconstitutional on its face as a prior restraint on speech and as unconstitutionally vague. Generally, prior restraints are subject to the highest degree of scrutiny and are the form of regulation most difficult to sustain under the First Amendment. See Near v. Minnesota ex rel. Olson, 283 U.S. 697, 713-20 (1931). However, the prior restraint of speech within secondary schools is not per se unconstitutional. See Hazelwood, 484 U.S. at 273 n.6; Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14, 822 F.2d 747, 750 (8th Cir. 1987).

As to vagueness, Henerey argues that Rule KJ-R effectively gives the principal unfettered discretion to determine what materials are unacceptable. As we noted in Bystrom, however, "a high degree of generality is made necessary by the subject matter. The concepts involved (indecency, vulgarity, likelihood of material disruption) are general by their very nature." 822 F.2d at 750. The rule furthers several legitimate interests of public schools identified in Bystrom, including the interest in assuring that "school hours and school property are devoted primarily to education as embodied in the district's prescribed curriculum," and the interest in "preserv[ing] some trace of calm on school property." 822 F.2d at 750. More generally, Rule KJ-R appears to be "one expression of the 'legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political.'" Id. at 750-51 (quoting Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 864 (1982) (opinion of Brennan, J., joined by Marshall and Stevens, JJ., announcing the judgment of the Court)); cf. Bull v. Dardanelle Pub. Sch. Dist. No. 15, 745 F.Supp. 1455, 1457 (E.D. Ark. 1990) (upholding policy preventing students from running for council based on "lack of cooperation, rude conduct in class, excessive

absences or tardies, lack of responsibility, or inappropriate behavior in or out of school"). Moreover, the rule allows the principal a reasonable time period--twenty-four hours--to evaluate materials. See, e.g., Muller, 98 F.3d at 1534, 1541 (upholding similar twenty-four-hour prescreening requirement in public school setting as a reasonable prior restraint). Accordingly, we do not find the rule unconstitutional on its face, and we agree with the district court that Dr. Cook's decision to disqualify Henerey for his failure to comply with the rule represented a reasonable response to that noncompliance. See Poling, 872 F.2d at 763-64.

## C.

Even assuming, for the purpose of argument, that Henerey's action in handing out the condoms constituted the expression of constitutionally protected speech and that Dr. Cook's action in disqualifying Henerey was motivated by a disagreement with the content of that speech, it does not follow that a First Amendment violation necessarily occurred. As the Sixth Circuit observed in a case involving a student council election, "[t]he universe of legitimate pedagogical concerns is by no means confined to the academic." Poling, 872 F.2d at 762. Thus, for example, "schools must teach by example the shared values of a civilized social order." Fraser, 478 U.S. at 683 (quoted in Poling, 872 F.2d at 762). These shared values include "discipline, courtesy, and respect for authority." Poling, 872 F.2d at 762. In addition,

> a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting. A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with "the shared values of a civilized social order,"

-10-

or to associate the school with any position other than neutrality on matters of political controversy.

Hazelwood, 484 U.S. at 272 (quoting Fraser) (citations omitted). As the Sixth Circuit put it, "[c]ivility is a legitimate pedagogical concern." Poling, 872 F.2d at 758. So, too, is compliance with school rules. See Bull, 745 F.Supp. at 1459.

The distribution of condoms is qualitatively different from the handing out of candy or gum. The one can be read to signify approval or encouragement of teenage sexual activity. The other constitutes the traditional bestowing of a de minimis gratuity not associated with any social or political message. School districts have an interest in maintaining decorum and in preventing the creation of an environment in which learning might be impeded, an interest that was particularly strong in the present case because the condom distribution occurred within the context of a school-sponsored election. Henerey's distribution of the condoms carried with it the implied imprimatur of the school, see Hazelwood, 484 U.S. at 271, for the other students would most likely have assumed that Henerey had complied with Rule KJ-R and had secured approval for the distribution. The District has a legitimate interest in divorcing its extracurricular programs from controversial and sensitive topics, such as teenage sex, see Hazelwood, 484 U.S. at 272, an interest that would be brought to naught were the school administration not allowed to discipline those whose conduct would necessarily embroil those extracurricular activities in the very topics from which they were to remain free.

Nor can there be any doubt that teenage sex is a controversial topic in the public schools. For example, parents have brought suit against school districts because their children were exposed to offensive or graphic materials without their consent. See, e.g., Parents United for Better Schools, Inc. v. School Dist. of Philadelphia Bd. of Educ., 148 F.3d 260 (3d Cir. 1998); Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525 (1st Cir. 1995). At the very least, school districts have an interest in requiring prior notice from anyone proposing to introduce students to information or

-11-

materials of an explicit sexual nature, notice that would enable school administrators to avoid or at least minimize the threat of costly confrontations by arranging accommodations for those with strong objections to such material. Thus, it was well within the District's rights to disqualify Henerey for his actions in distributing material that ran counter to the District's pedagogical concern and its educational mission.

## Conclusion

"[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." Hazelwood, 484 U.S. at 273. "It is only when the decision to censor a school-sponsored . . . vehicle of student expression has no valid educational purpose that the First Amendment is so directly and sharply implicated as to require judicial intervention to protect students' constitutional rights." Id. (citations, internal quotation marks and brackets omitted). That was not the case here, and thus we affirm the summary judgment.

The judgment is affirmed.

WOLLE, District Judge, dissenting.

In my view, Adam Henerey's First Amendment claim deserved a better fate than summary judgment. Genuinely disputed factual issues, decided in his favor, might well have resulted in a jury verdict granting him some relief in money damages from one or more of the defendants who disallowed his election as junior class president of St. Charles High School.

I focus on the reason that the school principal gave for disqualifying Henerey from holding his elected office, a reason this record discloses may have been a pretext for censoring the content of his safe-sex message. Henerey had obtained advance approval of his campaign slogan – "Adam Henerey, The Safe Choice." On the date of

-12-

the election, he offered to hand out campaign stickers with about twenty condoms to any student who requested one. The principal's only stated reason to disqualify Henerey was his failure to comply with School Board Rule KJ-R, quoted in part in the majority opinion. That rule, entitled, "<u>ADVERTISING IN THE SCHOOLS</u>", may have given inadequate notice to students that materials Henerey wished to distribute might need advance approval while candy and buttons other candidates were handing out would not need advance approval. Arguably the rule also failed to give Henerey adequate notice that handing out his materials might cause disqualification from serving in the elective office he sought.

I believe jurors, drawing reasonable inferences from the evidence, could find that the school principal and other administrators applied the Rule KJ-R to Henerey and not others only when they realized that Henerey's message connoted prevention of sexual diseases by use of such protective devices as condoms. From the principal's approval of materials like candy and buttons distributed by other candidates and refusal to allow Henerey's materials, a jury could well decide it was the message and not the approval process that cost Henerey his junior class presidency. Reasonable jurors could also conclude that disqualification was a punishment disproportionate to Henerey's failure to receive specific advance approval to distribute his materials to students requesting them.

I disagree with the suggestion that safe sex among high school students is such a controversial topic that school officials may squelch its discussion in a school-sponsored school election contest.

I therefore respectfully dissent from the summary rejection of Adam Henerey's First Amendment claim.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.