Diana DURAN, By and Through
her guardians, Ernest and
Diane DURAN

v.

Linda NITSCHE, Kenneth Swart, Roy C.
Claypool, Terrance Furin, Sharon
Keith–Hopper, and the Members of the
Owen J. Roberts School Board, Individually and in their official capacities.

Civ. A. No. 90–4980.

United States District Court,
E.D. Pennsylvania.

Nov. 22, 1991.

William A. Bonner, Media, Pa., for plaintiff.

James D. Scheffey, Pottstown, Pa., Jeffrey H. Quinn, Philadelphia, Pa., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BECHTLE, Chief Judge.

### FINDINGS OF FACT

1. Plaintiff Diana Duran was a fifth grade student at East Coventry Elementary School of the Owen J. Roberts School District during the 1989–1990 academic year. East Coventry Elementary is a public school in Pottstown, Pennsylvania. Plaintiff, through her parents as guardians, brings this action against one of her fifth grade teachers, her fifth-grade principal, and various school district officials.

2. Plaintiff was a student in the school's Academically Talented Program ("ATP"). The ATP class met once each week. Defendant Linda Nitsche was the teacher of plaintiff's ATP class.

3. Sometime in March of 1990, defendant Nitsche gave the ATP class an "independent study" assignment. Students were to work on the independent study project during the remainder of the school year. The assignment required each stu-

dent to choose a topic for research. Defendant Nitsche and the individual student's parents were to approve the topic. Students were then required to report, during the weekly ATP class period, on research progress during the remainder of the year. Students were given a "timeline" of weekly dates on which the completion of various portions of the research was expected. The research was to culminate in an oral report to be presented to defendant Nitsche and the other ATP students.

4. Students were instructed to chose a topic by filling in a blank on a form given to them by defendant Nitsche. The form stated that topics should be related to "The Power of _____." Plaintiff chose as her topic "The Power of God." The topic was approved by defendant Nitsche and by plaintiff's parents.

5. Defendant Nitsche suggested to all ATP students that they begin their research by consulting an encyclopedia. Soon after the project had been assigned, plaintiff informed defendant Nitsche of plaintiff's view that the encyclopedia did not contain suitable material. Defendant Nitsche gave plaintiff permission to use sources that plaintiff had in plaintiff's home.

6. As part of the assignment, students were required to bring their research materials to ATP class each week so that their progress on their project could be monitored by defendant Nitsche during class time. Contrary to assignment instructions, plaintiff never brought any research materials to class.[1] Further, plaintiff was not prepared for the ATP classes to the extent such classes involved the research project. Plaintiff did not meet any of the deadlines set forth in the "timeline" established by defendant Nitsche.

7. Defendant Nitsche informed the ATP students that they could include, as one of their sources, a survey of other students' views on the particular topic that was the subject of their independent study. Plaintiff was one of several ATP students who decided to conduct such a survey.

8. Sometime before her oral report was to be presented, plaintiff submitted a handwritten list of proposed survey questions to defendant Nitsche for review. Defendant Nitsche typed the survey form for plaintiff, but told plaintiff that the survey form needed more work. At no time did defendant Nitsche grant plaintiff permission to distribute her survey form. Plaintiff photocopied the survey form on school premises, despite the fact that defendant Nitsche did not grant plaintiff permission to do so. Faculty permission is generally a prerequisite to student use of school photocopying facilities.

9. The survey forms contained five "multiple choice" type questions. After asking for a student's gender, age, and class, the survey asked:

4. Do you believe in God?
   Yes
   No
   If your answer is no, please hand in your survey now.
5. I believe in God's power to
   control my life
   control life and death
   forgive sin
   other

A box to be checked was placed next to each choice.

10. There was nothing on the form other than these questions and some simple instructions. Accordingly, there was nothing on the form to indicate whether the survey had been prepared by a school official or by a student.

11. The ATP students were scheduled to deliver their oral presentations on June 8, 1990. Several days before her presentation was to be given, plaintiff distributed

---

**1.** The exhibits submitted by plaintiff at trial include a list of the resource materials plaintiff intended to use in her oral report. The list was prepared by plaintiff sometime before the report was to be given. Defendant Nitsche, however, never saw this list, as defendant Nitsche made no reference to it when discussing which of plaintiff's materials she had seen prior to the day on which plaintiff was to give her oral report. The list created by plaintiff consisted of four sources: 1) the Bible, 2) a book entitled "Born Crucified," 3) a magazine article entitled "It Happened to Me," and 4) a newsletter known as "Einfelt's Prayer Letter."

her survey form to other students. Approximately thirty of these forms were completed and returned to plaintiff.

12. On the morning of the day on which ATP students were scheduled to give their oral presentations, plaintiff asked one of her teachers, identified by the parties only as "Mr. Latshaw," if he would distribute survey forms to five (5) student volunteers from Mr. Latshaw's class. After reviewing plaintiff's survey form, Mr. Latshaw refrained from distributing it to students; instead, he brought the survey form to the attention of the principal of the school, defendant Kenneth Swart.

13. Defendant Swart informed Mr. Latshaw that he should not distribute the survey forms. Defendant Swart then called plaintiff to his office, at which time he informed plaintiff that teachers would not be permitted to distribute the survey form to other students. Defendant Swart told plaintiff, however, that he would instruct defendant Nitsche that plaintiff's failure to include these surveys in her oral report should not warrant a deduction in plaintiff's grade for the assignment. At no time did defendant Swart tell plaintiff that she was not permitted to use the results of the surveys that she had distributed herself, nor did he tell her that she was precluded from distributing more survey forms without teacher assistance.

14. Later that day, the ATP students met to give their oral presentations. To that point defendant Nitsche had knowledge, by virtue of the repeated progress reports that were to have been given during the previous classes, of only two items related to the report that plaintiff proposed to present. Those two items were plaintiff's survey form and a list of "questions" that plaintiff intended to incorporate into her oral report as issues for discussion. Written answers to the questions were prepared by plaintiff after she had drafted the questions, but defendant Nitsche did not see these answers at any time prior to the oral report. The questions seen by defendant Nitsche, along with the answers prepared by plaintiff but not seen by defendant Nitsche, were as follows:

Q: What kind of power does God have?

A: God has all power. He controls everything. God created the earth.

Q: How is God's love power?

A: God loves all people. He brings souls to him through his love.

Q: What has God done with his power?

A: God has created the universe. He arose Lazarus from the dead, cast out demons, and created people and animals.

Q: How powerful is God?

A: God is all powerful. He can do anything.

Q: How can you see God's power through his work?

A: When you pray, he answers you. You can see the answers. This is God's power working.

Q: What can God's power do?

A: God's power can do anything. He controls life and death.

15. Plaintiff's unpreparedness kept defendant Nitsche from knowing the precise nature of plaintiff's proposed report. Without such information, defendant Nitsche was concerned as to whether the report was appropriate for the fifth grade classroom setting. Based on this concern, defendant Nitsche decided to keep plaintiff from presenting her oral report to the rest of the class. Instead, defendant Nitsche required plaintiff to present her report to defendant Nitsche in the school library, without the presence of other students.

16. Plaintiff gave her oral report to defendant Nitsche in the library. The report consisted only of plaintiff reading her previously prepared "questions and answers."

17. Plaintiff's parents approached the school district about the incident. Both defendant Swart and defendant Nitsche responded to the plaintiff's parents by justifying their decisions in writing.

18. At all times relevant to these occurrences, the School District had no stated policy specifically governing religion in School District schools. Policy No. 6144, however, governing "Controversial Issues and the School Program," was in place at

the time of the incidents now in question. Since these incidents, the School District has adopted a policy specifically relating to religion in the classroom.

DISCUSSION

Plaintiff claims violations of her constitutional right to free speech guaranteed by the First Amendment to the United States Constitution. Plaintiff claims these violations occurred by virtue of: 1) defendant Swart's decision to preclude distribution of the survey form, and 2) defendant Nitsche's decision to require plaintiff to give her oral presentation in the library, rather than in the classroom. Plaintiff seeks a declaration of the existence of an unwarranted First Amendment violation, and an injunction prohibiting the School District from acting similarly in the future.[2] Defendants claim that no free speech violation occurred, and that even if one did, that the First Amendment's Establishment Clause justifies any free speech intrusion under these circumstances.

■ It has become an axiom of First Amendment law that students do not shed their right to freedom of expression at the schoolhouse gate. *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506, 511, 89 S.Ct. 733, 736, 739, 21 L.Ed.2d 731 (1969). At the same time, however, the rights of students to express their views are not coextensive with the rights of adults in other settings. *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

■ In analyzing the Constitution's free expression clause in the public school context, the court must first determine whether the school has designated a public forum for discourse under the particular circumstances of a given case.[3] If such a public forum does not exist, content-based[4] restrictions on speech need only be "reasonable in light of the purpose served by the forum and ... viewpoint neutral." *Cornelius v. NAACP Legal Defense and Education Fund*, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985). In the educational setting, the standard for determining the reasonableness of a content-based restriction on school sponsored expressive activity in a non-public forum is whether the restriction is "reasonably related to legitimate pedagogical concerns." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988). If a public forum does exist, a content-based restriction on speech must be substantially related to meeting a compelling state interest. *Cornelius, supra.* If it finds a first amendment violation, the court must, in the case of restrictions on speech of a religious nature made in a public forum, also determine whether the speech at issue would violate the Establishment Clause to such an extent as to provide the school with the "compelling state

---

2. Plaintiffs complaint also states a claim for monetary damages, but this claim was expressly abandoned at trial.

3. For purposes of First Amendment analysis, there are three types of forums: traditional public forums, designated or limited public forums, and closed forums. The only forum issue presented by this case is whether the school created a designated or limited public forum or whether the forum remained closed. No legitimate argument can be made that the classroom setting is a traditional public forum because it is not a place that has "immemorially been held in trust for the use of the public and, time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

The court recognizes the emerging line of cases holding that public forum analysis is not

appropriate in all free speech/public school cases. *See Slotterback v. Interboro School District*, 766 F.Supp. 280, n. 10 (E.D.Pa.1991) (and cases cited therein). These cases have intimated that public forum concepts are not applicable when the speech is not school sponsored. *See e.g., Burch v. Barker*, 861 F.2d 1149, 1158–59 (9th Cir.1988). For reasons discussed *infra*, however, the speech at issue in this case is school sponsored, so that public forum analysis is required.

4. As noted in the court's Findings of Fact, defendant Nitsche's decision to hear the report in the library was based, in large part, on her concern over whether the subject matter would be appropriate for fifth grade students. As also noted in the Findings of Fact, defendant Swart based his decision to preclude faculty distribution of the survey forms on the religious content of the survey. Accordingly, the court concludes that both decisions were "content-based."

interest" necessary to justify a content-based free speech limitation in a public forum. *Bender v. Williamsport Area School District,* 741 F.2d 538 (3d Cir.1984), *vacated on other grounds,* 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986); *Gregoire v. Centennial School District,* 907 F.2d 1366 (3d Cir.), *cert. den.,* — U.S. ——, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990).

■ Several factors are relevant in determining whether the state has created a designated public forum. First, the court must look to governmental intent by evaluating "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius,* 473 U.S. at 803, 105 S.Ct. at 3449. Second, the court must analyze the use to which the forum has been put by examining whether the forum "has been limited by well-defined standards tied to the nature and function of the forum." *Gregoire,* 907 F.2d at 1371, *citing Perry Education Ass'n. v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46–47, 103 S.Ct. 948, 955–956, 74 L.Ed.2d 794. Third, a court may also look to the "permission procedure" related to such speech, and to whether similar speech has been permitted or disallowed in the past. *Gregoire,* 907 F.2d at 1371, *citing Cornelius,* 473 U.S. at 804–805, 105 S.Ct. at 3450–51. *See also, generally, Slotterback v. Interboro School District,* 766 F.Supp. 280 (E.D.Pa.1991).

■ Under these standards, this court has little difficulty determining that no public forum was established by the school with respect to either the distribution of the survey forms or the oral presentation. First, there has been absolutely no evidence presented that could support a conclusion that a public forum was created for the purpose of distributing survey

forms by teachers during class periods. It would seem that a somewhat unusual set of facts must be presented before a court could rule that a school established a forum for uninhibited discourse in which teachers themselves would be required to disseminate surveys for student projects that relate to other classes. Suffice it to say that no such evidence was presented in the case at hand.[5] Certainly, there is no evidence of governmental "intent" with respect to opening a forum for such a purpose in this case, and the "well defined standards" to which teachers are typically held do not require the use of the classroom for such purposes. There is no evidence of a "permission procedure" that was in place for such a purpose.

Second, defendant Nitsche did not create a "public forum" when she permitted students to give oral presentations on their report topics in her classroom. There is no evidence of her intent to allow the use of the ATP class period as a forum for open discussion. Indeed, defendant Nitsche testified that while she respects the rights of her students to express their views under appropriate circumstances, the primary purpose of the independent study assignment was to engage the students in an introduction to research skills. The independent study was not designed to operate as a vehicle for student expression and debate.[6]

The "permission procedure" analysis, as contemplated by *Cornelius,* further supports the conclusion that defendant Nitsche did not establish an open forum. Before topics were assigned, they were approved by defendant Nitsche and then by the students' parents. At no time were students given the impression that they would be permitted to pick any topic of their choice. Presumably, the question of granting permission to a given topic carried with it

5. It should be recalled that this court, after consideration of the conflicting testimony given by plaintiff and defendant Swart, has made the factual determination that defendant Swart only precluded plaintiff from using surveys that would have been distributed by teachers. Both parties admit that plaintiff was never precluded from actually distributing any surveys herself. Accordingly, this case does not present issues stemming from the extent to which distribution of the surveys must be permitted in a non-classroom setting.

6. Defendant Nitsche testified that "in this case the assignment was not an opportunity for students to present an oral presentation of their opinions." N.T. at 114, lines 10–12.

issues concerning whether the proposed topic would give rise to a proper educational experience for the student performing the research, and whether the topic's subject matter would be appropriate for fifth grade classroom discussion. Given the age of the students, defendant Nitsche understandably retained a right of approval over topic selection so that she could evaluate these concerns. The procedure by which defendant Nitsche solicited and approved of topic choices undoubtedly falls far short of permitting the type of unrestricted, uninhibited discourse necessary to support the existence of a designated public forum.[7]

■ Having concluded that no public forum existed, the court turns to whether the restrictions at issue were "reasonably related to legitimate pedagogical concerns." Because the restrictions are rational regulations of activities that are school sponsored and/or curriculum related,[8] the court concludes that the restrictions are, in fact, constitutionally permissible.

As the Supreme Court has recognized, the right of school officials to regulate student expression expands when the speech at issue is made in connection with school sponsored activity:

Educators are entitled to exercise greater control over [speech in school sponsored settings] to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.

*Hazelwood,* 108 S.Ct. at 570. The *Hazelwood* Court cited several lower court decisions recognizing the heightened deference afforded school officials on decisions related to school sponsored speech.[9] Additionally, several courts since *Hazelwood* have rejected challenges to regulations of in-school expression on the ground that the speech was school sponsored or curriculum related. *See, e.g. Poling v. Murphy,* 872 F.2d 757 (6th Cir.1989), *cert den.,* 493 U.S. 1021, 110 S.Ct. 723, 107 L.Ed.2d 742 (1990) (regulations governing speech in high school student elections upheld, in part, because elections are school sponsored); *Alabama Student Party v. Student Government Ass'n,* 867 F.2d 1344 (11th Cir.1989) (election regulations upheld on same grounds in university setting); *Miles v. Denver Public Schools,* 944 F.2d 773 (10th Cir.1991) (school's authority to regulate teachers' speech is greater when teacher is speaking in the classroom setting); *Bishop v. Aronov,* 926 F.2d 1066 (11th Cir.). (noting that university classrooms are closed forums "during instructional periods.") In contrast, restrictions on student speech that have been held unconstitutional have involved school administrations' attempts to impose limitations on expres-

7. The fact that defendant Nitsche initially approved plaintiff's topic does not change the fact that the forum remained closed. Defendant Nitsche's approval of plaintiff's topic only demonstrates her initial belief that the topic was reasonable in light of the appropriate considerations. Defendant Nitsche's later determination, based on subsequent developments, that plaintiff should not give her report to the rest of the ATP class does not change the fact that the forum was not "public;" rather, it only reflects the fact that defendant Nitsche had reached the conclusion that Diana's progress reports had not satisfied her that the report was proper for the fifth-grade classroom setting.

8. In *Hazelwood,* the court found that a high school student newspaper was school sponsored for purposes of First Amendment forum analysis in part because of the imprimatur of school

endorsement stemming from the amount of control of the newspaper retained by the faculty. Certainly, the act of requiring a teacher to distribute survey forms to fifth grade students during class time presents an even stronger imprimatur of school sponsorship than that presented in *Hazelwood.* As for the oral report, it could be said that it strains language even to call the presentation school "sponsored." Because it was part of an assignment related to an actual class, the report was, in fact, school itself.

9. *See Hazelwood,* 108 S.Ct. at 571, n. 7, *citing Nicholson v. Board of Education Torrance Unified School Dist.,* 682 F.2d 858 (9th Cir.1982); *Seyfried v. Walton,* 668 F.2d 214 (3d Cir.1981); *Trachtman v. Anker,* 563 F.2d 512 (2d Cir.1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978); *Frasca v. Andrews,* 463 F.Supp. 1043 (E.D.N.Y.1979).

sion *outside* of the classroom. *See, e.g., Gregoire, supra,* (rejecting limitation on use of school auditorium after school hours); *Grace Bible Fellowship v. Maine School Administrative District,* 941 F.2d 45 (1st Cir.1991) (speech permissible where school used premises "not simply for educationally-related purposes.").

In addition to the fact that the speech at issue in this case arises in the context of school sponsorship, three considerations mentioned in *Hazelwood* support the constitutionality of the restrictions now at issue. The *Hazelwood* Court permitted educators to exercise greater control when, *inter alia:* 1) students would be exposed to material that is inappropriate for their particular maturity level, 2) students would be subjected to expression that could be "erroneously attributed to the school," and 3) the proposed speech is "ungrammatical, poorly written, *inadequately researched,* [or] biased or prejudiced...." *Hazelwood,* 108 S.Ct. at 570 (emphasis supplied).

Defendant Nitsche's trial testimony demonstrates how these three factors combine in the case at hand. Defendant Nitsche testified that:

> This independent study project is not something that a fifth grader goes off and does on their own. It is a learning process. It is part of our curriculum, in that the students are learning how to become independent learners, how to become researchers. Throughout that process, Diana had at no time brought her material to class for me to see and for me to review with her, on a weekly basis, her progress in her work.

N.T. at 110, lines 17–25. When asked to explain what plaintiff's lack of preparation had to do with her decision to hear the oral report in the library, defendant Nitsche stated that:

> Through the entire process, I had seen Diana's survey and I had also seen her list of, I think, perhaps five questions. I'm not sure exactly. I had seen no other evidence other than what the questions were, no answers, and the survey. And based on those two pieces of information, I concluded that her report

would perhaps be something that my other fifth-grade students should not be a party to. I did not want to appear to support nor put down any type of religion in front of my other students.

N.T. at 111–12, lines 24–07. Defendant Nitsche also added:

> My concern is for my other fifth-grade students in my classroom, and I did not want to promote or denigrate any type of religion in my classroom Fifth-graders, when you, as a teacher, allow things to occur in your classroom, believe, as a rule, that what is occurring is something that the teacher supports. When we have discussions in my classroom, I very strongly avoid giving my own opinion, so that the children would think that there is only one way to do something.

N.T. at 114–15, lines 22–05. Finally, defendant Nitsche stated "I think the students very possibly could have accepted [plaintiff's report] as something that I believed and promoted myself." N.T. at 115, lines 12–15. Defendant Swart offered similar justifications for his decision to preclude faculty distribution of the surveys:

> I was concerned, too, that the teacher— that a teacher distributing that, again— and keeping in mind that it is a fifth-grade-aged student, 10–year-old, generally speaking, would assume that was the teacher's response or that they were to respond to the teacher, that teachers often hand out tests, et cetera, where the child must complete the test and return it to the teacher. And I felt that there was a—I had concern for that.

N.T. at 120, lines 9–17.

Each of the three *Hazelwood* concerns listed above combined to form the basis for the decisions made by defendants Nitsche and Swart. Both school officials were obviously troubled by the impact of teacher involvement with religious subject matter on students of relatively tender years. To use the language of *Hazelwood,* both defendants Nitsche and Swart felt that the material was "inappropriate for [the students'] level of maturity," because of the substantial risk that "the views of the individual speaker [would be] erroneously at-

tributed to the school." *Hazelwood,* 108 S.Ct. at 570. Moreover, defendant Nitsche had additional justification for her decision to hear the report in the library because plaintiff's independent study project was "inadequately researched." *Id.*

The court need not engage in an analysis of whether the defendants' assessments of their students' propensities were "right," i.e. whether, in fact, fifth-grade students are too young to be able to appreciate the difference between private speech and school sponsored speech. The court need only determine, as it does, that the defendants' concern was reasonable. The need for judicial restraint in evaluating matters such as these is well established. For example, in *Poling, supra,* a student was removed from candidacy in a school election for making a remark in a campaign speech that school officials considered tasteless. In upholding the school officials' actions, the Sixth Circuit stated:

> It may well be that a more relaxed or more self-assured administration would have let the incident pass without declaring [the student] ineligible, and perhaps that is what this administration ought to have done; it is not for us to say. Such a question, we believe, represents a judgment call best left to the locally elected school board, not to a distant, life tenured judiciary. *Cf. Bethel School District No. 403 v. Fraser* 478 U.S. 675, 683, 106 S.Ct. 3159, 3165 [92 L.Ed.2d 549] ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.").

*Poling,* 872 F.2d at 761. Similarly, this court agrees that evaluations of the particular capabilities of fifth grade students, in the context of curriculum related activity, is best left to those who are most familiar with the students' educational aptitude.

Given that the defendants justified their decisions on the very concerns that re-

ceived expressed approval by the Supreme Court in *Hazelwood,* the court concludes that the restrictions on speech in the case at hand were reasonably related to legitimate pedagogical concerns, and are therefore constitutional. Accordingly, Policy No. 6144 and the policy now in place relating to religion in the school are deemed valid to the extent that they are interpreted to permit restrictions on speech of the same nature as the restrictions imposed in this case.

In light of the court's conclusion that no free speech violation has occurred, the court need not address the defendants' alternative argument relating to a compelling state interest arising out of the constitution's Establishment Clause. The court stresses that its discussion of the defendants' justifications based on the ability of fifth-grade students to discern private speech from school sponsored speech should not be confused with a full blown Establishment Clause inquiry. The court makes no conclusions as to whether the speech now at issue meets any of the three prongs of the Establishment Clause test set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1970) (does the proposed action have a secular purpose, would the proposed action have a primary effect which neither advances nor inhibits religion, and would such action avoid excessive government entanglement with religion). The court holds merely that the restrictions on speech in this case were reasonable, regardless of whether permitting the speech would have resulted in an Establishment Clause violation. *See Hedges v. Wauconda Community Unit School Dist. No. 118,* 1991 WL 222163, n. 19, 1991 U.S. Dist. LEXIS 14873, n. 19 (N.D.Ill.1991) (an interest in avoiding religious entanglement with the school is legitimate; whether that interest is "compelling" is irrelevant in a closed forum).[10]

10. The court also notes that the Supreme Court recently heard oral argument in *Weisman v. Lee,* 908 F.2d 1090 (1st Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991). *Weisman* involves the constitutionality of school imposed prayer recitals at graduation

ceremonies. *Weisman* and cases like it have no bearing on this case because they present the inverse of the question now faced by this court; rather than involving a school that seeks to restrict student speech, the *Weisman*-type cases involve students that seek to restrict school-

Finally, the court notes that plaintiff, both at trial and in proposed conclusions of law, has made vague, cursory references to violations of the Constitution's Equal Protection Clause. No equal protection violation has occurred. Plaintiff has failed to identify a suspect class to which she belongs. Accordingly, the restriction at issue need only be rationally related to a legitimate state interest. *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985). From the analysis set forth above, it should not be surprising that the court determines that the state's interest in promoting the educational process by protecting students from inappropriate speech is legitimate, and that the restrictions at issue are rationally related to that goal.

In light of the foregoing, the court makes the following Conclusions of Law:

## CONCLUSIONS OF LAW

1. No public forum has been created by the School District.

2. The restrictions on speech in this case were reasonably related to legitimate pedagogical concerns.

3. In both the case of the decision to preclude distribution of survey forms by teachers and in the case of the decision to require plaintiff to give her report in the library, there has been no unconstitutional restriction of plaintiff's freedom of expression.

4. There has been no violation of the Constitution's Equal Protection Clause.

5. Plaintiff is not entitled to either declaratory or injunctive relief.

speech. Obviously, there is no governmentally imposed limitation on speech in the *Weisman* cases. In the absence of such a limitation, the *Weisman* cases have no occasion to consider the appropriate standards for restricting freedom of expression. Stated another way, a different standard applies when the school attempts to restrict religious speech (free speech analysis) then when the school attempts to actually issue religious speech (Establishment Clause analysis).