**Kelly E. DeNOOYER, by Next Friend Ilene DeNOOYER and Ilene DeNooyer, Plaintiffs,**

v.

**LIVONIA PUBLIC SCHOOLS, et al., Defendants.**

No. 91–72963.

United States District Court, E.D. Michigan, S.D.

July 30, 1992.

David R. Melton, Grandville, Mich., Alexis I. Crow, Charlottesville, Va., for plaintiffs.

Robert A. Lusk, Christopher M. Murray, Detroit, Mich., for defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

This matter has come before the Court upon the parties' cross motions for summary judgment. Plaintiffs are Kelly DeNooyer, an elementary student enrolled in Livonia Public Schools, and her mother, Ilene DeNooyer. Plaintiffs brought suit pursuant to 42 U.S.C. § 1983, alleging that

Defendants violated their Constitutional rights when Defendants prohibited Kelly DeNooyer from showing a videotape of herself singing a proselytizing religious song to her second grade class during show and tell. Defendants include the Livonia Public Schools and the following administrative personnel: (1) Carole Samples, Assistant Superintendent for Instruction; (2) Dr. Kent Gage, Director of Elementary Education; (3) Jane Van Poperin, Principal of McKinley Elementary School; and (4) Joseph Merinelli, Superintendent. For the reasons stated in this opinion, the Court grants Defendants' motion for summary judgment and denies the summary judgment motion filed by the Plaintiffs.

## I. Facts

During the 1990–1991 school year, Kelly DeNooyer was a second grade student at McKinley Elementary School in the Livonia Public School District. Her teacher, Mrs. Sandra Solomon, instituted a V.I.P. program, a type of show and tell in which a different student would be a "V.I.P." each week and would be permitted to bring special belongings to school to present to the class. The V.I.P. program was part of the curriculum for second grade students in Mrs. Solomon's class, designed to promote poise and self esteem through developing oral communications skills in the class-room. Elementary students receive a grade in oral communications. The Principal, Jane Van Poperin, approved the program which took place during the regular instructional time of the class.

When Kelly DeNooyer was selected to be V.I.P., she brought in a videotape of herself singing before the congregation at Temple Baptist Church where she and her mother are members. Kelly asked to show the tape to the class, and Mrs. Solomon reviewed it pursuant to a school policy which required her to do so. Kelly appeared on the videotape singing "I Came to Love You Early," a proselytizing song.[1]

Mrs. Solomon conferred with Principal Van Poperin, and they agreed that Kelly should not be permitted to show the video. Mrs. Solomon told Kelly that she would not be allowed to show the tape, and informed Ilene DeNooyer of the school's decision. Ilene DeNooyer contacted Principal Van Poperin, Kent Gage (the Director of Elementary Education), and Carole Samples (Assistant Superintendent), requesting that Kelly be permitted to show her video. Principal Van Poperin, Dr. Gage, and Superintendent Samples[2] all confirmed the School District's decision not to permit the showing of the video.

The School District gave various reasons for prohibiting the playing of the video-

---

1. The lyrics to the song are as follows:
   Verse 1
   I felt sometimes I didn't have a story I could share.
   I wasn't rescued from a past destroyed by dark despair.
   O but, Jesus, I have memories of the times that we've been through.
   And I wouldn't trade one moment of growing up with You.
   Refrain
   I came to love You early, came to know You young.
   You touched my heart, dear Jesus, when my life had just begun.
   I gave You my tomorrows and a childish heart of sin,
   And You've saved me from a lifetime of what I might have been.
   Verse 2
   You filled some days with laughter; You held me when I cried.
   You said, "Child, you can do anything;" You helped me when I tried.

   No I treasure ev'ry mem'ry, and I'm sure there couldn't be
   A child who could have known more love than You have given me.
   Verse 3
   I remember how You touched me, but I can't explain at all
   How a choice that's so important could be made by one so small,
   I just put aside my questions; what You said to do, I've done,
   And I thank You for the blessings of coming to You young.
   (Refrain)
   Sue Smith, *I Came to Love You Early* (First Verse Music (ASCAP) 1989).

2. Superintendent Joseph Merinelli is also a named defendant in this lawsuit. Although Plaintiffs never brought this matter before him, he was sent copies of correspondence between Plaintiffs and the other named Defendants.

tape. Mrs. Solomon indicated that showing a videotape was inconsistent with the purpose of the V.I.P. program, which was designed to develop self esteem through oral presentations in the classroom. Because playing a videotape does not involve speaking before the class, it would not advance the program's objectives. (Affidavit of Sandra Solomon). Further, Mrs. Solomon was concerned that permitting Kelly to show the videotape would encourage other students to bring in videos too. She wanted to avoid the time consuming process of previewing videotapes and using class time to show them; she felt that the time was needed for instruction. The school administrators were also concerned about the message of the song on the videotape, which is about a young child accepting Jesus Christ as her savior.[3] Mrs. Solomon felt that second graders might not have the maturity to understand the context in which the song was presented, that the students might assume that the School District endorsed the message of the song,[4] and that the song might embarrass or offend other students and their parents. *Id.* In addition, in a letter to Ilene DeNooyer, Dr. Gage stated the policy of the Livonia Public Schools as follows:

> We affirm all children in their own traditions. Freedom of religion is a fundamental right. A separation of church and state mandates no official or unofficial sponsorship of religion and the schools must remain wholly neutral. Thus, a teacher may teach about religion ... but shall not act as a disseminating agent for any religious or anti-religious document, book, article, person, agency or the like. It is the responsibility of all faculty members and the administration to see that such activities do not place an atmosphere of social compulsion or ostracism on those who choose to or not to participate in any religious/cultural exercise or activity.

Letter dated January 15, 1991, from Dr. Gage to Mrs. DeNooyer.

As a result of the school's refusal to permit Kelly to show her videotape to her second grade class, Kelly and her mother brought suit against the Livonia Public Schools and certain school officials. The Complaint alleges violations of their Constitutional rights to freedom of speech, free exercise of religion, equal protection, freedom of association, and the liberty interest of a parent to educate her child.[5]

## II. Standard for Summary Judgment

In considering a motion for summary judgment, the Court may grant the motion only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). As the Supreme Court ruled in *Celotex*, "Rule 56(c) mandates the entry of summary judgment, after ade-

---

**3.** Kelly DeNooyer testified in her deposition that she wanted to share the message of the song with her classmates "[b]ecause I might have a chance to help people get saved." (Kelly DeNooyer 23). However, Kelly's purposes in wanting to show the videotape are not at issue in this lawsuit.

**4.** Defendants contend that if the tape was shown, the students would have inferred that the teacher and the school endorsed the message of the video, and that it would have disrupted the classroom. Defendants submitted the Affidavit of Dr. Thomas Berndt, a professor of child psychology at Purdue University. After reviewing the videotape, Dr. Berndt indicated that in his opinion if Kelly had been permitted to show the video, the other students would have concluded that the song's message was endorsed by the teacher. Dr. Berndt based his conclusion of the "social cues" of the situation— the teacher would have permitted the playing of the video during class time, and any positive comment, whether about the song or Kelly's singing, may have led the students to believe the school endorsed the message. (Affidavit of Dr. Berndt). Dr. Berndt also indicated that the song may have disrupted the classroom because second graders are not able to understand that others have views different than their own and, when confronted by diverse views, they conclude that those views are dumb or bad. *Id.* In reaching its decision on this matter, the Court neither accepts nor rejects the opinion of Dr. Berndt but merely notes that the opinion supports the reasons advanced by Defendants for deciding not to permit the video.

**5.** Plaintiffs alleged various violations of state law as well. The Court previously dismissed these pendent claims pursuant to an Order signed by Judge Paul V. Gadola on October 28, 1991.

quate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The court must view the allegations of the complaint in the light most favorable to the non-moving party. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir. 1983). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 265, 106 S.Ct. 2505, 2518, 91 L.Ed.2d 202 (1986).

However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256, 106 S.Ct. at 2514. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue' for trial." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989) (citing *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

In this case, the parties have submitted cross motions for summary judgment, and there is no dispute concerning any material facts.

### III. Freedom of Speech

■ Although the religion clauses of the First Amendment are implicated due to the religious character of the speech at issue in this case, in essence this is a free speech case. The First Amendment, applicable to the States via the Fourteenth Amendment, guarantees the right to free speech. *See, e.g., Tinker v. Des Moines Independent Community School Dist.,*

393 U.S. 503, 507, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. at 736. However, where student initiated speech occurs as part of the curriculum in the closed forum of a classroom, school authorities may limit the speech as long as their actions are "reasonably related to legitimate pedagogical concerns." *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

### A. Forum Analysis

■ In *Hazelwood,* the Supreme Court held that a school could control the style and content of student-authored articles published in the student newspaper. The Court first engaged in a forum analysis in order to determine the level of scrutiny required to evaluate the school's actions. There are three types of forums: traditional public forums, limited public forums, and closed forums. Traditional public forums include areas such as streets and parks that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." 484 U.S. at 267, 108 S.Ct. at 567 (quoting *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). Limited public forums are those created by the State when it opens its property for expressive activity. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The government may only restrict speech in public forums or limited public forums if the restriction is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. *Id.* at 45, 103 S.Ct. at 954. If State facilities have not been dedicated to public use but have instead been reserved for other purposes, they are closed forums. The State may impose reasonable restrictions on speech in closed forums. *Id.* at 46, 103 S.Ct. at 955.

■ Schools are not traditional public forums. *Hazelwood,* 484 U.S. at 267, 108 S.Ct. at 567. However, school officials

may create a limited public forum if, by policy or practice, they open the school for indiscriminate use by the public. *Id.* (citing *Perry,* 460 U.S. at 48, 103 S.Ct. at 956). In *Hazelwood,* the Court held that school officials did not intend to open the school newspaper as a public forum for indiscriminate use by student reporters and editors or by the school body generally. The school newspaper was published as part of a journalism class taught by school faculty during school hours. The journalism teacher maintained a great deal of editorial control; for instance, he selected the editors, assigned story topics, and edited stories. Although the students maintained some authority over the contents of the paper in order to learn leadership abilities, the school maintained ultimate control over the paper. The Court held that the paper was a closed forum and that school officials were entitled to regulate the paper's contents in any reasonable manner. *Id.* 484 U.S. at 268–70, 108 S.Ct. at 568–69.

Other courts have followed *Hazelwood* and found that classrooms are not public forums if there is no evidence that school authorities have opened them for indiscriminate public expression. *See, e.g., Miles v. Denver Public Schools,* 944 F.2d 773, 776 (10th Cir.1991) (ninth grade classroom not public forum); *Bishop v. Aronov,* 926 F.2d 1066, 1071 (11th Cir.1991) (university classrooms are not public forums during instructional period), *cert. denied sub nom. Bishop v. Delchamps,* —— U.S. ——, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992).

In addition, several courts have emphasized that the difference in maturity level between the university level and that of the high school or elementary level makes it less likely that the school would have opened the forum for unregulated speech. *See e.g., Bender v. Williamsport Area School Dist.,* 741 F.2d 538 (3d Cir.1984), *vacated on other grounds,* 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (because high school curriculum is circumscribed, unlikely that authorities opened forum for unlimited discussion); *Bell v. Little Axe Independent School Dist. No. 70,* 766 F.2d 1391, 1401 (10th Cir.1985) (reservations expressed in *Bender* apply with even greater force to elementary school).

One court, in addressing a case similar to this one, found that even where an elementary school teacher permits students to give oral presentations, the teacher has not opened the classroom for open discussion. *Duran v. Nitsche,* 780 F.Supp. 1048, 1053–54 (E.D.Pa.1991). In *Duran,* the teacher reviewed and approved of the students' reports prior to their oral presentations before their fifth grade class. The court emphasized that this review procedure belied any contention that the teacher had designated her classroom as an open forum.

■ The undisputed facts establish that the Livonia Public Schools did not open the classrooms at McKinley Elementary School for unregulated public speech. The fact that Kelly DeNooyer was invited to speak in front of her class as part of a V.I.P. program, part of the regular curriculum, does not show that the school opened its doors for indiscriminate public expression. The fact that Mrs. Solomon previewed Kelly's tape indicates the closed nature of the classroom. Kelly DeNooyer's second grade classroom was a closed forum during class hours, at the time she wished to show her videotape. Because Kelly asserts a right to speech in a closed forum, the school authorities may regulate the content of her speech in any reasonable manner. *Hazelwood,* 484 U.S. at 270, 108 S.Ct. at 569.

*B. School–Sponsored Speech*

1. "Legitimate Pedagogical Concerns"

In addition to holding that speech in the closed forum of the classroom could be regulated in any reasonable manner, in *Hazelwood* the Supreme Court found that school-sponsored speech that is part of the curriculum also may be reasonably regulated. The Court distinguished *Tinker* as follows:

The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different

from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

*Hazelwood,* 484 U.S. at 270–71, 108 S.Ct. at 569–70. The Court held that school authorities may restrict school-sponsored expression so long as such restrictions are reasonably related to "legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. at 570.

The Supreme Court gave examples of permissible concerns. A school may ensure that the participants learn the lesson the activity is required to teach, that students are not presented with material inappropriate for their level of maturity, and that students' views are not mistakenly attributed to the school. *Id.* at 271, 108 S.Ct. at 570. Public schools may refuse to sponsor student speech that might associate the school with "any position other than neutrality on matters of political controversy." *Id.* at 272, 108 S.Ct. at 570. Even in *Tinker,* where speech that was not school-sponsored was at issue, the Supreme Court noted that a student's right to free speech in school is limited. While the Court upheld the right of high school and junior high school students to wear black armbands to school in protest of the Vietnam war, the Court stated that speech could be prohibited if it materially and substantially interfered with the needs of school discipline, would substantially interfere with the work of the school, or would impinge upon the rights of other students. 393 U.S. at 509, 89 S.Ct. at 737.

The Sixth Circuit Court of Appeals recently followed *Hazelwood* in *Poling v. Murphy,* 872 F.2d 757 (6th Cir.1989), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 723, 107 L.Ed.2d 742 (1990), where a student was disqualified from running for student council due to a speech he made at a school assembly. First, the Sixth Circuit found that the student's speech was school-sponsored. The school held an assembly during school hours and required that all students attend; the school determined the eligibility of the speakers at the assembly and screened the speeches. *Id.* at 762. Secondly, the court found that the actions of the school authorities were reasonably related to legitimate pedagogical concerns. In his speech, the student had ridiculed the assistant principal of the school. The court found that the school had a legitimate concern in promoting the values of discipline, courtesy, and respect for authority. *Id.*

Both the Supreme Court and the Sixth Circuit emphasized that the standard of review for censorship of school-sponsored speech is consistent with the policy that education is a matter of local concern for parents, teachers and school officials and not for federal judges. *Hazelwood,* 484 U.S. at 273, 108 S.Ct. at 571. Local control over schools is "one of this nation's most deeply rooted and cherished traditions." *Poling,* 872 F.2d at 763.

> Local school officials, better attuned than we to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted. We may disagree with the choices, but unless they are beyond the constitutional pale we have no warrant to interfere with them.

*Id.* at 762.

Following the reasoning of *Hazelwood* and *Poling,* the Eastern District of Pennsylvania found no violation of the right to free speech in a case almost identical to this one. In *Duran v. Nitsche,* 780 F.Supp.

1048, a fifth grader claimed that her right to free speech was violated when her teacher refused to permit her to give an oral presentation to her class about her belief in God. The court found that the speech at issue could be limited by the constraints of school sponsored speech. "As for the oral report, it could be said that it strains language even to call the presentation school 'sponsored.' Because it was part of an assignment related to an actual class, the report was, in fact, school itself." *Id.* at 1054 n. 8.

Further, in *Duran,* the court found that the actions of the school authorities were based upon reasonable pedagogical concerns, i.e., that the religious nature of the speech was inappropriate for the level of maturity students have reached in fifth grade. The court held that it was reasonable for the school not to want to take the substantial risk that the students' views would be erroneously attributed to the school. *Id.* at 1055–56.

■ In this case, Kelly DeNooyer sought to show a videotape of herself singing a proselytizing religious song as part of a "V.I.P." program in her second grade classroom. The V.I.P. program was a show and tell activity conducted as part of the regular curriculum during class hours. Kelly's teacher, Mrs. Solomon, determined the selection of students for the program and screened the presentations made by the students. As in *Duran,* Kelly's presentation to her class was a class assignment; it was more than school-sponsored speech, it was "school itself."

Further, the Livonia school authorities had legitimate pedagogical interests in deciding that Kelly DeNooyer should not show her video. The purpose of the V.I.P. program was to teach children oral communication skills. Showing a videotape would circumvent this purpose. The school authorities wanted to avoid encouraging other children to bring in videotapes, because showing them preempts instructional time. The school had a policy of having all videotapes reviewed before classroom use. Moreover, because the show and tell was conducted during classroom instructional time, all students were required to attend. The school wanted to avoid a situation where other students and their parents would be offended by the religious content of the speech they were required to listen to or would infer the school's endorsement of the speech presented during class. The maturity level of the second grade students was a significant concern.

**2. Establishment Clause Defense**

The Defendants have raised the Establishment Clause issue as a defense to Plaintiffs' claims. If this case were one that involved nonschool-sponsored speech in a public forum, the State could regulate it based on its content only if it had a compelling interest to do so. Avoiding a violation of the Establishment Clause could be such a compelling reason. *See e.g., Bell v. Little Axe,* 766 F.2d at 1407 (establishment clause violation is compelling interest that justifies content-based prohibition of religious speech at public school); *Lundberg v. West Monona Community School Dist.,* 731 F.Supp. 331, 341 (N.D.Iowa 1989) (interest in avoiding establishment of religion outweighs right to free speech and free exercise and thus prayer at graduation should not be allowed).

In this case, however, the Court need only find that concern about the impact of the religious message of the tape on a second grade audience, presented during class time, was a legitimate pedagogical concern. The Court need not decide that a contrary decision by the Defendants would have violated the Establishment Clause. The Court's discussion of the Defendants' rationale in refusing to permit the video based on the ability of the second grade students to distinguish between private speech and school sponsored speech should not be confused with an inquiry under the Establishment Clause. This Court merely finds that the School District's restriction on Kelly's speech was reasonable, regardless of whether permitting the speech would have violated the Establishment Clause. *Duran,* 780 F.Supp. at 1056.

### C. Use Versus Access

Plaintiffs argue that forum analysis is appropriate only where *access* to State property is at issue, as in *Hazelwood*, and is inappropriate where *use* of State property is at issue, as in *Tinker*. This contention is without merit. The Supreme Court has not made the "use" versus "access" distinction urged by Plaintiffs. The Supreme Court in *Hazelwood* distinguished *Tinker* by holding that *Tinker* was not school-sponsored speech. As explained above, *Hazelwood* uses forum analysis and is directly applicable to this case; thus, this Court relies on *Hazelwood*.

Further, school speech cases that fail to use public forum analysis are factually distinguishable from *Hazelwood* and from the case at bar. *Hazelwood*, like this case, involved student expression in the classroom that was part of the curriculum and was sponsored by the school. The cases cited by Plaintiffs that did not use forum analysis involved extra-curricular student distribution of written material on school property. *See, e.g., Slotterback v. Interboro School Dist.*, 766 F.Supp. 280 (E.D.Pa. 1991) (distribution of religious tracts in public high school); *Rivera v. East Otero School Dist.*, 721 F.Supp. 1189 (D.Colo. 1989) (distribution of religious newspaper in public high school).

In arguing the use versus access dichotomy, Plaintiffs rely upon a law review article published before *Hazelwood* and a law review published later that relies on the first article. Laycock, *Equal Access and Moments of Silence: The Equal Status of Religious by Private Speakers*, 81 NW Univ.L.Rev. 1, 48 (1986) [hereinafter cited as *Laycock*]; Whitehead, *Avoiding Religious Apartheid: Affording Equal Treatment for Student–Initiated Religious Expression in Public Schools*, 16 Pepperdine L.Rev. 229, 247–48 (1989). The original commentator did not have *Hazelwood* available to him when he suggested the use/access distinction, and the Supreme Court's analysis in *Hazelwood* defies this categorization.

Plaintiffs' assertion that *Hazelwood* is an "access" case and thus is distinguishable from *Tinker* is without merit. The distinction between "use" cases and "access" cases has not clearly been defined. The law review commentator who appears to have originated the "use versus access" idea argued as follows: "public forum analysis is irrelevant when access is not at issue. When citizens are going about their business in a place they are entitled to be, they are presumptively entitled to speak." *Laycock*, 81 N.W.L.Rev. at 48. Under this standard, *Tinker*, *Hazelwood*, and this case are all cases where the *use* of the forum is at issue. In *Tinker*, the students engaged in speech at school, a place where they had a right to be, by wearing armbands in protest of the Vietnam war. In *Hazelwood*, journalism class students wrote articles for a school paper. The students already had access to the forum, the newspaper.

Here, Kelly DeNooyer had a right to be in her classroom participating in a show and tell presentation. She is not seeking "access" to the classroom. Like *Hazelwood*, this case is readily distinguishable from those where a group is seeking access to use a classroom for the group's meetings. *See, e.g., Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (registered student group sought access to state university facilities for religious worship and discussion; Court engaged in forum analysis). Thus, even in a case dealing with the *use* of public property, the Supreme Court analyzed the type of forum being used for the contested speech. *Hazelwood*, 484 U.S. at 267–70, 108 S.Ct. at 567–69. As described above, the second grade classroom was a closed forum subject to reasonable restrictions and legitimate pedagogical concerns, and the Court finds that the reasons expressed by the Defendants meet that requirement.

### IV. Free Exercise

Plaintiffs state in Count II of their Complaint that Defendants violated their rights under the Free Exercise Clause of the First Amendment by placing a burden on Kelly DeNooyer's ability to freely exercise her religious beliefs. "The free exer-

cise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. C.I.R.*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989). Plaintiffs fail to name the central religious belief that they allege is burdened by the school authorities' censorship of the videotape.

In a factually similar case, another district court found that a school district's prohibition of public prayer as part of a graduation ceremony did not violate the complainants' rights under the Free Exercise Clause. *Lundberg v. West Monona Community School Dist.*, 731 F.Supp. 331 (N.D.Iowa 1989). In *Lundberg*, the school district voted to ban invocation and benediction at the high school graduation. A student, his father, and parents of other students sued the school district claiming that their right to freely exercise their religion was violated. Plaintiffs alleged that under the tenets of their religion "it is appropriate, proper and desirable to acknowledge the spiritual aspects of life upon such an occasion by way of including a simple invocation and benediction as part of the ceremonial event." The court found that although prayer may be a cardinal principle of the claimants' religious beliefs, *public* prayer was not. *Id.* at 340.

The court reasoned further that although the First Amendment prohibits the state from compelling an individual to affirm or disclaim a religious belief, the right to free exercise of religion does not mean that an individual can "use the machinery of the state to practice [her] beliefs." *Id.* at 340 (citing *Abington School Dist. v. Schempp*, 374 U.S. 203, 226, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963)). *See also Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058 (6th Cir.1987) (because students were not required to affirm or disaffirm any religious beliefs by using textbooks they found offensive to their religion, they were not compelled in violation of free exercise

clause), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988).

The government is not required to join in a religious practice or to take action to further the beliefs or spiritual development of individuals. *Id.* (citing *Bowen v. Roy*, 476 U.S. 693, 699–700, 106 S.Ct. 2147, 2151–2152, 90 L.Ed.2d 735 (1986)). In a case rejecting a claim that the Free Exercise Clause required a school district to permit prayer in the classroom, the Second Circuit noted, "The authorities acted well within their powers in concluding that plaintiffs must content themselves with having their children say these prayers before nine or after three; their action presented no such inexorable conflict with deeply held religious belief...." *Stein v. Oshinsky*, 348 F.2d 999, 1002 (2d Cir.), *cert. denied*, 382 U.S. 957, 86 S.Ct. 435, 15 L.Ed.2d 361 (1965).

Plaintiffs have not brought forth any evidence that the school's decision to prevent Kelly DeNooyer from showing her videotape during class substantially burdened any central religious belief or practice.[6] Further, school authorities are not required to take action that would advance Plaintiffs' religious beliefs. As a result, Plaintiffs have failed to bring forth evidence to support their claim under the Free Exercise Clause. Rule 56 thus requires the Court to grant summary judgment for the Defendants.

## V. Equal Protection

▆ Plaintiffs contend that the school censored Kelly's video due to its content, a particular Christian message, and that another student was permitted to discuss a menorah (a Jewish religious symbol) at show and tell. Thus, they argue, their right to equal protection under the Fourteenth Amendment was violated. By alleging that the school authorities interfered with their fundamental right to free speech, Plaintiffs impliedly request that the

---

6. Plaintiffs do not name any central religious belief or practice burdened by Defendants. It should be noted that proselytizing is *not* an

obligation of the Baptist religion. (Ilene DeNooyer 135–36).

Court apply strict scrutiny to the actions of the Defendants.

The Court has already concluded that no violation of a fundamental right was implicated in this case. As discussed above, Plaintiffs' rights to free speech and to free exercise were not violated. In addition, Plaintiffs do not allege that they are members of any suspect class. When a plaintiff is not a member of a suspect class and no fundamental right is implicated, the inquiry under the equal protection clause is whether the state action rationally furthers a legitimate state purpose. *Carlson v. Village of Union City*, 601 F.Supp. 801, 812–13 (W.D.Mich.1985) (citing *San Antonio Independent School Dist. v. Rodriquez*, 411 U.S. 1, 55, 93 S.Ct. 1278, 1308, 36 L.Ed.2d 16 (1973)). *See Brown v. Alexander*, 718 F.2d 1417, 1423 (6th Cir.1983) (strict scrutiny does not apply because there was no First Amendment violation). Thus, strict scrutiny does not apply, and the actions of the school authorities do not violate the equal protection clause as long as there was a rational basis for such actions.

The Livonia School authorities had a rational basis for prohibiting Kelly DeNooyer from playing her video and for permitting another student, Amber Cole, to talk about the menorah during a presentation regarding Israel. The school officials wanted to encourage students to develop their classroom communication skills and wanted to avoid using instructional time for the showing of videos. Playing Kelly DeNooyer's videotape would not advance these goals, and permitting Amber Cole's speech would. Further, school authorities wanted to avoid offending other students and parents. It was not unreasonable for the Defendants to conclude that Kelly's proselytizing song might offend other students and their parents, while the showing of a menorah or

the discussion of its use would be unlikely to cause controversy.[7]

Further, as Dr. Gage noted in his letter to Mrs. DeNooyer, "a teacher may teach about religion ... but shall not act as a disseminating agent for any religious or anti-religious document, book, article, person, agency or the like." The School District's concern that it might violate the Establishment Clause by playing Kelly's videotape of a proselytizing song is a rational basis for refusing to show the tape.[8] Playing the video might put the school in the position of acting as a "disseminating agent" for religion, a role prohibited by school policy. A discussion of the use of the menorah during a speech on the State of Israel falls in the category of speech permitted by the School District's policy, i.e. speech "about religion."

In sum, because Defendants have articulated a rational basis for their decisions distinguishing between the presentations of the two students, Plaintiffs have no equal protection claim. Summary judgment on this issue is granted in favor of the Defendants.

### VI. *Freedom of Association and Liberty Interest*

Plaintiffs also allege that they were deprived of their right of free association. Complaint, Count II. Ilene DeNooyer also contends that Defendants violated her liberty interest "to instill in her daughter certain moral and religious values as central to her education and upbringing." Complaint, Count III, para. 35. No evidence has been presented to support these propositions. "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury

---

**7.** Plaintiffs contend that Amber Cole brought in a menorah during her V.I.P. week and as part of show and tell. Plaintiff's Brief in Support of Motion for Summary Judgment, p. 4. Defendants assert that the student merely discussed the use of the menorah during a talk on the State of Israel. (Kelly DeNooyer 14–15). In either case, the school authorities had a rational

basis for distinguishing between Kelly DeNooyer's videotape and Amber Cole's speech.

**8.** Again, even though this is a reasonable concern, the Court does not hold that the playing of the videotape would have constituted an unconstitutional establishment of religion. It is not necessary to reach the Establishment Clause issue in this case.

verdict." *Anderson v. Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514. Summary judgment is hereby granted on these claims as well.

### Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED.